IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SAMUEL LEE JONES,                    §
TDCJ-CID NO. 682025,                 §
                                     §
          Plaintiff,                 §
v.                                   §          CIVIL ACTION NO. H-06-1119
                                     §
AKBAR SHABAZZ, *et al.*,             §
                                     §
          Defendants.                §

<u>MEMORANDUM AND ORDER</u>

Plaintiff Samuel Jones, a state inmate proceeding *pro se* and *in forma pauperis*, filed this civil rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), codified at 42 U.S.C. § 2000cc-1, *et seq.* (Docket Entries Nos. 1, 45, 46). Defendants have filed a motion for summary judgment and a supplemental motion for summary judgment (Docket Entries Nos. 40, 60), and Plaintiff has filed responses to each motion. (Docket Entries Nos. 53, 55, 56, 66, 70). Plaintiff has also filed two motions for summary judgment. (Docket Entries Nos. 55, 66). He further seeks to file a supplemental motion for summary judgment. (Docket Entries Nos. 74, 75). For the reasons that follow, the Court will grant, in part, and deny, in part, the motions for summary judgment.

## I.  Background and Pleadings

Plaintiff is a member of the Nation of Islam ("NOI"). (Docket Entry No. 1).  In 33 claims, Plaintiff alleges that Defendants Akbar Shabazz - the Director of the Islamic Chaplains at Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID"), Bill Pierce - the Director of the Chaplaincy Department, Richard Lopez - the Regional Program Administrator, Douglas Dretke - the Director of TDCJ-CID, and Chaplain Charles Kiser, violated his rights under the Free Exercise Clause of the First Amendment, the RLUIPA, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment with respect to religious videotapes, books, services, diet, prayer oil, the hiring of chaplains, his religious name, strip searches inconsistent with religion, and hostility toward his religious sect. (Docket Entries Nos. 1, 45, 46).  Plaintiff further alleges that Defendants conspired to deprive him of his rights and retaliated against him because he sought to enforce such rights through the inmate grievance system.  (Id.).

Defendants move for summary judgment on grounds that Plaintiff is barred from raising allegations about violations of a consent decree and that he has not established a claim under the Equal Protection Clause, First Amendment, or RLUIPA. (Docket Entries Nos. 40, 60).  Defendants also seek summary judgment on grounds

that Plaintiff fails to state valid retaliation and conspiracy claims.  (Docket Entry No. 60).

Plaintiff moves for summary judgment on the claims alleged in his prior pleadings.  (Docket Entries Nos. 55-2, 66).

## II.   Discussion

A party seeking summary judgment bears the burden of informing the district court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the movant carries this burden, the burden shifts to the non-movant to show that summary judgment should not be granted.  Id.  All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## A.   Claims Regarding Religious Expression

Plaintiff alleges that TDCJ officials have violated his First Amendment right to the free exercise of his faith and his statutory rights under RLUIPA, and engaged in religious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.  To avoid redundancy, the Court will state the law applicable to Plaintiff's claims and examine each claim under the

applicable law.[1]  All claims challenging the <u>Brown v. Beto</u>, Civil Action No. H-69-CV-74 (S.D. Tex. 1977) (O'Conner, J.) consent decree will be examined in a later section.

1.    <u>Legal Standards</u>

    a.    <u>First Amendment</u>

The First Amendment requires that a prisoner must be allowed reasonable opportunities to practice his religion.  <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  A prison regulation that impinges on an inmate's fundamental right is valid if it is reasonably related to legitimate penological interests.  <u>Turner v. Safley</u>, 107 S. Ct. 2254, 2261 (1987).  To determine whether a challenged regulation is valid, the Court considers four factors:  (1) whether a "valid, rational connection [exists] between the prison regulation and the legitimate governmental interest put forward to justify it," <u>id.</u> at 2262, (2) whether there are alternative means of exercising the rights that remain open to the inmates; (3) the impact that accommodation of the asserted constitutional right will have on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's rights at <i>de minimus</i> cost to valid penological

---

[1] Although Plaintiff alleges that each Defendant violated his right to due process of law, he states only one factual allegation that would give rise to such claim, namely, the taking of his personal property consisting of DVD's and the like.  Thus, a due process analysis will be made only when it is in fact raised by the pleadings.

interests.  O'Lone v. Estate of Shabazz, 107 S. Ct. 2400, 2405-07
(1987).  The court accords prison officials broad discretion and
deference in making and administering policies that are needed to
maintain institutional order.  Thornburgh v. Abbott, 109 S. Ct.
1874, 1883 (1989).

        b.    Equal Protection

     "The Equal Protection Clause directs that 'all persons
similarly circumstanced shall be treated alike.'"  Plyler v. Doe,
102 S. Ct. 2382, 2394 (1982) (citation omitted).  However, things
that are different in fact or opinion do not have to be treated as
if there were no difference.  Id.  To succeed on an equal
protection challenge, a plaintiff must prove purposeful
discrimination resulting in a discriminatory effect among persons
similarly situated.  McCleskey v. Kemp, 107 S. Ct. 1756, 1766
(1987).  A "discriminatory purpose" implies that a particular
course of action was selected "at least in part because of, and not
simply in spite of, the adverse impact it would have on an
identifiable group."  Woods v. Edwards, 51 F.3d 577, 580 (5th Cir.
1995).  A plaintiff must prove specific acts that support a claim
of discrimination; his personal belief that he was subject to such
discrimination is insufficient to prove an equal protection
violation.  Id.  "To maintain his equal protection claim
independently of his free exercise claim, [a plaintiff] must allege

5

and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." <u>Taylor v. Johnson</u>, 257 F.3d 470, 473 (5th Cir. 2001) (citing <u>City of Cleburne v. Cleburne Living Ctr.</u>, 105 S. Ct. 3249, 3353-54 (1985)).

c.   <u>Religious Land Use & Institutionalized Persons Act</u>

The RLUIPA provides that the government shall not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc-1(a)(1)-(2). To support a claim under the RLUIPA, a plaintiff must produce *prima facie* evidence that defendants substantially burdened his exercise of religion; he also bears the burden of persuasion on whether the policies and regulations substantially burden the same. 42 U.S.C. § 2000cc-2(b). <u>Adkins v. Kaspar</u>, 393 F.3d 559, 567 (5th Cir. 2004). A "religious exercise" for purposes of the RLUIPA includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

A governmental action or regulation creates a "substantial burden" on a religious exercise if it truly pressures the offender significantly to modify his religious behavior and significantly

violates his religious beliefs.   <u>Adkins</u>, 393 F.3d at 569-70 &

n. 37.  Specifically, the Fifth Circuit has stated the following:

> [T]he effect of a government action or regulation is
> significant when it either (1) influences the adherent to
> act in a way that violates his religious beliefs, or
> (2) forces the adherent to choose between, on the one
> hand, enjoying some generally available, nontrivial
> benefit, and, on the other hand, following his religious
> beliefs. On the opposite end of the spectrum, however,
> government action or regulation does not rise to a level
> of a substantial burden on religious exercise if it
> merely prevents the adherent from enjoying some benefit
> that is not otherwise generally available or acting in a
> way that is not otherwise generally allowed.

<u>Id.</u>, at 570.

The accommodation of religious observances is not elevated

over a prison's need to maintain order and safety.   <u>Cutter v.</u>

<u>Wilkinson</u>, 125 S. Ct. 2113, 2122-23 (2005).  Although the RLUIPA

imposes the strict scrutiny standard on prisons, the courts are to

apply that standard with "due deference to the experience and

expertise of prison and jail administrators in establishing

necessary regulations and procedures to maintain good order,

security and discipline, consistent with consideration of costs and

limited resources."  <u>Id.</u>, 125 S. Ct. at 2123 (citation omitted).

The Supreme Court specifically noted that "[l]awmakers supporting

RLUIPA were mindful of the urgency of discipline, order, safety,

and security in penal institutions."  <u>Id.</u> (indicating that RLUIPA

will be applied "in an appropriately balanced way, with particular

sensitivity to security concerns").  The RLUIPA does not elevate

7

accommodation of religious observances over a prison's need to maintain order, security, and safety, consistent with consideration of costs and limited resources.  A prison is free to resist requests for religious accommodations that either impose unjustified burdens on other prisoners, or jeopardize the effective functioning of a prison.  Id. at 2125.

2.  Application to Claims

a.  Access to Religious Material

In claims 1, 3, 4, 9, 14, 16, 19, 23, 24, and 25, Plaintiff complains that TDCJ chaplains and administrative officials have denied him and NOI inmates access to religious videotapes and DVDs, books, newspapers, and prayer oil.  (Docket Entries Nos. 1-2, 46).

(i)  Literature

In claims 16, 19, and 23, Plaintiff challenges TDCJ's policy regarding access to religious material as applied to him because prison officials have denied him access to the materials he desires under the pretext that they are inflammatory.  (Docket Entry No. 1-2).

TDCJ policy provides that inmates may receive religious material, subject to receipt and review in accordance with TDCJ Correspondence Rules ("Rules").  (Docket Entry No. 40).  Such Rules provide that "[a]ll publications are subject to inspection by the

8

MSCP (Mail Systems Coordinators Panel)." (<u>Id.</u>).  With respect to content inspection of publications, the Rules authorize MSCP staff to reject a publication for content if "[i]t contains material that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of prisons through offender disruption such as strikes or riots[.]" (<u>Id.</u>, Ex. C, p.37).

In claim 16, Plaintiff complains that TDCJ has engaged in religious censorship by denying his request for two secular books, <u>Without Sanctuary</u> and <u>From Niggas to Gods</u>, on the ground that they were inflammatory.  (Docket Entry No. 1-2 and Ex. 12).  Plaintiff notes in Step 1 Grievance No. 2005200545, but not in his pleadings, that his religion mandates that in addition to studying Islam, NOI adherents must also study "all secular knowledge." (<u>Id.</u>, Ex. 12). He argues, "So, in censoring and denying us to receive 'Without Sanctuary,' and 'From Niggas to Gods,' TDCJ-CID is infringing upon the constitutional rights" of NOI adherents freely to practice their religion.  (<u>Id.</u>).  Plaintiff, however, admits that the books are secular and that the book, <u>Without Sanctuary</u>, contains photographs of lynchings.  (Docket Entries Nos. 1-2, Ex. 12; 40-6, pp.63-64).  At least one other court has determined that the photographs in <u>Without Sanctuary: Lynching Photography in America</u> are inflammatory. *See generally* <u>Williams v. New York City Housing Authority</u>, 154 F.Supp. 2d 820, 824-24 (S.D.N.Y., 2001); *see also*

<u>Borzych v. Frank</u>, 439 F.3d 388, 390 (7th Cir. 2006) (holding denial of violent books as compelling state interest and the least restrictive means under RLUIPA).

Because the books are secular, Plaintiff has not shown purposeful religious discrimination by TDCJ in its application of the publications policy; therefore, Defendants are entitled to summary judgment on an equal protection claim.  Likewise, Plaintiff has not shown that the denial of the two books pursuant to the publications policy constituted religious censorship in violation of the First Amendment.  The books constitute a part of the large body of "all secular knowledge," to which Plaintiff most certainly has considerable access through other publications.  Although Plaintiff and other inmates state by declaration that the books are mandated by the NOI as required reading (Docket Entry No. 55-2, Ex. 64), an NOI publication, also attached to his response, shows that <u>Without Sanctuary</u> is recommended reading, and not mandated reading. (Docket Entry No. 55-3, p. 33).  The NOI publication does not mention <u>From Niggas to Gods</u> in either the mandatory or recommended reading list.  (<u>Id.</u>).  Therefore, Plaintiff fails to show that TDCJ's denial of his request for these secular books, especially in light of other accessible reading material, in any way materially burdens the exercise of his faith in violation of RLUIPA. Accordingly, Defendants are entitled to summary judgment on claim 16.

In claim 19, Plaintiff complains that he has been unjustifiably denied receipt of the NOI religious newspaper, <u>The Final Call</u>. (Docket Entry No. 1-2). Plaintiff's exhibit shows that the newspaper was temporarily removed from the approved publications list but after further review, it was returned to the approved list. (Docket Entries Nos.1-15, p.15; 40-6, p.18). Plaintiff, therefore, fails to show a deprivation giving rise to a First Amendment, RLUIPA, or Equal Protection claim that would entitle him to injunctive or declaratory relief. Accordingly, Defendants are entitled to summary judgment on claim 19.

In claim 23, Plaintiff complains that TDCJ and Dretke have denied NOI adherents religious books written by Elijah Muhammad, the founder of the NOI, specifically, <u>Message to the Black Man</u>, <u>Our Savior Has Arrived</u>, <u>How to Eat to Live</u>, and <u>Fall of America</u>. (Docket Entry No. 1-2). A response to Step 2 Grievance No. 2006089892 reflects that per the Offender Correspondence Policy 3.91, which relates to racist remarks, the Director's Review Committee denied the books, <u>Our Savior Has Arrived</u> on January 22, 2004, and the <u>Fall of America</u> on May 4, 1993. (Docket Entry No. 46-2, Ex. 27). The response further shows that <u>Message to the Black Man</u> was approved and made available to inmates. (<u>Id.</u>). <u>How to Eat to Live</u> had not been reviewed as of April 11, 2006. (<u>Id.</u>).

Plaintiff claims the books are essential and mandatory for NOI adherents to read and study. (Docket Entry No. 55, p. 28).

Plaintiff further claims that the books are religious, are not racist or inflammatory, and do not advocate violence. (Id.). Plaintiff maintains the books had previously been approved for inmates, but a 2005 policy modification banned the books. (Id.).

The summary judgment record, however, reflects that TDCJ inmates consistently receive and have access to <u>Message to the Black Man</u> and <u>How to Eat to Live</u> and, in addition, also have access to another of Elijah Mohammad's books, <u>Mohammad Speaks</u>. (Docket Entry No. 40-10, p.8, Ex. H). Plaintiff presents no evidence to contravene Defendant's summary judgment evidence. Because Plaintiff fails to show a deprivation with respect to <u>How to Eat to Live</u> and <u>Message to the Black Man</u>, he fails to state a First Amendment, RLUIPA, or Equal Protection claim with respect to these two publications that would give rise to injunctive or declaratory relief.

Plaintiff has provided the Court with copies of <u>Our Savior Has Arrived</u> (Docket Entry No. 56, Ex. 61) and <u>Fall of America</u> (id., Ex. 62) through another inmate at the Clements Unit of TDCJ-CID via the United States Postal Service.[2]  The Court has examined both books and finds that the books contain material that reek with racial hatred and hostility directed at the "white race," and religious bigotry directed at Jews and Christians. Implied threats

---

[2] How "another inmate" was able to procure these two prohibited books, which he mailed to the Court from the Clements Unit, is not explained by Plaintiff or his accommodating fellow inmate.

of death (e.g., "should not [white Christians and Jews] be
destroyed . . .?" Our Savior Has Arrived, at 76) and other
inflammatory passages that may well incite racial and religious
conflicts and violence, are found in both books.

TDCJ's policy is to prohibit communication of information
designed to achieve the breakdown of prisons through offender
disruption,[3] and applies to any materials that may provoke offender
disruption, regardless of its sponsor.  Plaintiff has failed to
raise a material fact question that prison officials purposefully
discriminated against NOI adherents and Plaintiff by denying them
access to either of these books that contravene the policy.
Likewise, the Court finds that Plaintiff has failed to show that
his First Amendment right to exercise his faith has been violated
by the denial of access to these books.  (Oddly, as observed in
footnote 2, Plaintiff and his fellow NOI adherents evidently had
access to both books.)  The record also shows that Plaintiff and
NOI adherents have alternative means of expressing the NOI faith
outside the study of these two books.  The record further reflects
the detrimental impact such racially divisive literature may have
on other non Muslim and non Black inmates, guards, and the prison
resources necessary to maintain security.  (Docket Entry No. 40-7,
Ex. E).

---

[3] Without question, a rational connection exists between TDCJ's
Offender's Correspondence policy regarding inflammatory publications and
the prison's interest in the security of the prison.  (Docket Entry No.
40-7, Ex. E).

Plaintiff also fails to demonstrate a *prima facie* claim that denial of access to <u>Our Savior Has Arrived</u> and <u>Fall of America</u> substantially burdens the exercise of his faith. The record does not show that his inability readily to access these books has pressured him or other NOI adherents significantly to modify their religious behavior or that such denial significantly violates his religious beliefs. The Court accords prison officials broad discretion and deference in making and administering policies that are needed to maintain institutional security with respect to the MSPC's rejection of both books on racial issues. Accordingly, Plaintiff fails to state a First Amendment, RLUIPA, or Equal Protection claim with respect to access to <u>Fall of America</u> and <u>Our Savior Has Arrived</u>. Defendants are entitled to summary judgment on claim 23.

(ii) <u>Videotapes</u>

In claim 9, Plaintiff challenges TDCJ's policy that prohibits inmates from withdrawing money from their prisoner trust fund account to purchase religious videotapes. (Docket Entry No. 1-2). Plaintiff contends that prisoners are allowed to use their prison account money to purchase other religious material such as religious books, newspapers, prayer rugs, but not videotapes. (<u>Id.</u>).

14

Defendants' summary judgment evidence shows that TDCJ policy prohibits inmates from owning videotapes because such items can be used to make weapons. (Docket Entry No. 40-10, p.8; No. 60-4, pp.3-4). Inmates, however, may purchase these items and donate them to the Chaplaincy Program so that they and other inmates can view the videotapes. (Id.). The TDCJ prohibition is based on security reasons without regard to religious content.[4] Moreover, the fact that Plaintiff cannot personally possess videotapes does not by itself prevent him from viewing religious videotapes. It follows that Plaintiff has not raised a valid claim that the challenged TDCJ policy regarding the purchase of videotapes for personal possession is not reasonably related to legitimate penological interests, that it constitutes a burden on the free exercise of his religion under the RLUIPA, or that it is discriminatory. Defendants are entitled to summary judgment on claim 9.

In claims 1, 3, and 4, Plaintiff complains that TDCJ staff has acted or failed to act in such a manner as to deprive him and other NOI adherents of access to religious videotapes.[5] (Docket Entry

---

[4] To the extent Plaintiff asserts a religious based prohibition, he raises this assertion under his claims numbered 1, 3, 4, 24, and 25, which are addressed below.

[5] In claim 1, Plaintiff alleges Chaplains Akbar Shabazz and Charles Kiser conspired to defraud Plaintiff of his religious videotape lectures of Minister Farrakhan. (Docket Entry No. 1-2, p. 7). In claim 3, Plaintiff contends that NOI prisoners have been denied their right to receive and study videotape lectures by Farrakhan. (Id. at 12-13). In claim 4, Plaintiff asserts that TDCJ officials have engaged in religious

No. 1-2).  In support of these allegations, Plaintiff alleges the following:  In October of 2002, former Islamic Chaplain Omar Rakeeb, authorized Plaintiff to order three non-controversial videotape lectures of Minister Farrakhan, which were to be sent to Rakeeb for screening.  (Id. at 7).  On January 31, 2003, NOI Minister Jeffery Muhammad, informed Rakeeb that the three videotapes that Plaintiff requested were not available and that he was sending two replacement videotapes titled, "The Beauty of the Holy Qur'an" and "Jumah Prayer Kutbah Refuge in Allah."  When the tapes arrived, Rakeeb screened them for controversial content as mandated by TDCJ policy.  (Id.).  Rakeeb determined that the video-tapes were permissible for showing in TDCJ and the tapes were placed in the videotape library.  (Id.).  Later, two Muslim inmate coordinators, who were anti-NOI, wrote Chaplain Shabazz and informed him that Rakeeb had approved the videotape lectures by Farrakhan.  Shabazz immediately called Rakeeb and forbade him from allowing inmates to view the tapes.  (Id.).

Rakeeb rescinded his approval of the tapes and locked them in his office.  (Id. at 8).  Rakeeb informed Plaintiff that Shabazz had forbidden Beto I inmates from watching the tapes and that he, Rakeeb, was rescinding his approval of the tapes.  For about one year, the videotapes were kept locked in Rakeeb's office.  Before

---

discrimination by enforcing TDCJ's copyright policy only against NOI prisoners seeking Farrakhan videotapes.  (Id. at 13-14).

he left his job on Beto I, Rakeeb allowed the Muslim prisoners to watch the videotapes and placed the tapes in the Muslim Library. (Id.).  Shabazz took over as the regional Islamic Chaplain on the Beto I Unit and ordered the confiscation of the videotape lectures of Minister Farrakhan.  (Id.).

Plaintiff and other NOI adherents sought relief from this alleged order through the prison grievance system. (Docket Entries Nos. 1-5, 1-6, 1-8, 1-9, 1-10).  In response to the grievances, TDCJ administrators informed plaintiff that the tapes had been removed from the Muslim Library so that Chaplain Shabazz could review them.  The administrators indicated that Chaplain Kiser had sent the tapes by truck-mail but Shabazz never received the tapes. They further indicated that Shabazz and the Chaplaincy Department were attempting to locate copies of the tapes.  Once located, Shabazz would screen the tapes per TDCJ policy.  (Docket Entries No. 1-6, Ex. E, pp. 2-5, Grievance No. 2004058673, Grievance No. 200405867; No. 1-9, Ex. J, p.2, Grievance No. 2004084041).

In other grievances, plaintiff complained of religious discrimination, to which TDCJ officials responded with references to TDCJ policy regarding the possession and purchase of videotapes by inmates and TDCJ's copyright policy.  (Docket Entries No. 1-5, Ex. D, pp.3-5, Grievance No. 2004046577; No. 1-8, Ex. I, pp.2-5, Grievance No. 20041065240).  In Grievance No. 2004094283, plaintiff further grieved TDCJ's copyright policy as a misinterpretation of

17

the "Federal Government copyright law." (Docket Entry No. 1-10, Ex. L, p. 2). In response to the Step 2 Grievance, Chaplain Pierce gave a more detailed explanation of the Copyright Remedy Clarification Act and TDCJ's reason for obtaining from the copyright owner authorization to show such tapes. (Id. at 5).

Plaintiff does not show in his pleadings or summary judgment evidence whether Shabazz located the missing tapes or acquired new ones; nor does he indicate whether the tapes were screened and banned because of their content. Although Plaintiff claims that Shabazz and Kiser confiscated, stole, or delayed his access to the tapes because of their religious content,[6] his pleadings and exhibits show that the problems with receiving and viewing the videotapes were in the nature of mix-ups, delays, and bureaucratic

---

[6] Plaintiff states the following in his sworn complaint: Rakeeb told him that Shabazz had forbidden Rakeeb from showing the tapes to Beto Unit Muslim inmates. Thereafter, Plaintiff drafted a petition accusing Shabazz of forbidding the viewing of the tapes because of Shabazz's bias against Farrakhan, even though Farrakhan is not controversial or a security risk. (Docket Entry No. 1-4, pp. 6-7). Plaintiff, however, does not submit any summary judgment evidence or make a specific direct allegation in his complaint that Shabazz forbade the tapes based on their content.

In Step 2 Grievance No. 2004065250, Plaintiff complains that he is "appealing this grievance [because] Shabazz has verbally told us . . . that he will not review any videotapes of Minister Farrakhan." (Docket Entry No. 1-8, p. 4). Such statement is not competent summary judgment evidence and is too attenuated to raise a genuine issue of material fact that Shabazz did not review the Farrakhan videotapes. Moreover, it does not show that Shabazz refused to review Farrakhan videotapes or that he refused based on a religious bias against Farrakhan.

problems.[7]  Plaintiff's exhibits further show that the tapes in question were lost and the Chaplaincy Department investigated the loss and attempted to find them.  (Docket Entries Nos. 1-6, pp. 3, 5; 1-7, p. 12).  Defendants' exhibits also show that Plaintiff cannot own tapes himself.  (Docket Entries Nos. 60-4, pp. 3-4; 60-5, p. 2).  In any event, Plaintiff does not raise a genuine issue of material fact that he was unable to receive or view the videotapes in question because Defendants did not approve of their religious content.

Plaintiff also complains of religious discrimination with respect to TDCJ's enforcement of its copyright policy.  TDCJ's copyright policy requires officials to obtain appropriate authorization from the copyright owner for any showing of a videotape to a church group.  (Docket Entry No.1-10, p.5).  Plaintiff contends that TDCJ enforces this policy only against Muslim prisoners who are adherents of the NOI and who desire to receive and study videotape lectures by Minister Farrakhan. (Docket Entry No. 1-2).  He contends that Muslim prisoners who

_____

[7] Plaintiff's assertion that Chaplain Kiser stated he did not have any knowledge of the tapes and later inconsistently "finally admitted" that they "did in fact exist" (Docket Entry No. 1-2, p. 9) is not supported by the record.  In the exhibit submitted by Plaintiff in support of the first assertion, the respondent indicates that Kiser stated that he did not know where the tapes were located.  (Docket Entry No. 1-7, p. 2).  Plaintiff also asserts that Kiser confiscated the tapes on orders from Chaplain Shabazz.  However, the exhibit Plaintiff submits in support of this assertion does not show a confiscation.  (Docket Entry No. 1-9, p. 3).  Instead, Plaintiff's exhibit shows that Kiser sent the tapes to Shabazz.  (Id.).

19

follow the same Islamic sect as Shabazz are allowed to receive and study numerous videotape lectures of their religious teacher and leader Mohammed.   He further contends that other groups show Hollywood movies such as "Roots" and "Remember the Titans" without being required to obtain a written permission statement from the publisher regarding compliance with TDCJ copyright policy.   He claims that Christian prisoners are allowed to receive and study hundreds of videotape lectures from numerous different Christian teachers and show numerous Hollywood movies such as "Passion of the Christ" without obtaining a written permission statement from the publisher regarding compliance with the TDCJ copyright policy. (Id.).

Plaintiff also argues that other Muslim videotapes and Hollywood movies are shown without written permission from the publisher or copyright owner and submits exhibits in support of his contention.   (Docket Entries Nos. 1-2, p. 14; 1-13, pp. 1-6). Although his exhibits suggest, and in one case demonstrate, that these videotapes and movies are shown in prison, they do not show a lack of copyright permission when shown, as he conclusorily alleges.

Plaintiff does not raise a genuine issue of material fact that any Defendants wrongly seized the videotapes in question or stole them from Plaintiff, that they kept Plaintiff from viewing the tapes based on their religious content by conspiring to delay

screening or otherwise, or that they enforced copyright rules only against the Farrakhan tapes. Plaintiff has not raised a genuine issue of material fact that the TDCJ Chaplains in the foregoing 2002-03 incidents violated Plaintiff's First Amendment rights, or that they engaged in religious discrimination with respect to NOI videotapes such as to entitle Plaintiff to equitable relief. Accordingly, Defendants are entitled to summary judgment on claims 1, 3, and 4.

In claim 24, Plaintiff alleges that in 2005-06, Shabazz, Pierce, and Lopez continuously conspired to hinder him from receiving and studying Farrakhan videotape lectures mailed to their office for approval. He maintains that TDCJ officials have intentionally taken several months to screen tapes for approval. (Docket Entry No. 46). Specifically, Plaintiff alleges that during November of 2005, he arranged for two videotape lectures to be mailed to Shabazz's office for screening. (Id. at 6). Plaintiff asserts that as of August of 2006, nine months later, he still had not received his two videotapes, nor had he been informed of the screening status of the tapes. (Id.). Plaintiff alleges that Shabazz told Plaintiff the tapes were with Chaplains Pierce and Lopez. (Id.). Plaintiff states that he wrote Pierce and Lopez several times about the screening status of the tapes, but they refused to respond to his inquiries. (Id.).

In Grievance No. 2006114478, Plaintiff complained that Shabazz had engaged in religious discrimination with respect to the screening delay of the Farrakhan videotapes.  (Docket Entry No. 46-3, pp. 1-2).  Warden Johnson responded that the videotapes had been sent to the Religious Practice Committee ("RPC") and that the Chaplaincy Department was awaiting the RPC's response.  (Id.).  On May 5, 2006, in response to Plaintiff's Step 2 grievance, Chaplain Pierce indicated that the RPC had received the videotapes and that the tapes would be reviewed at the next meeting of the RPC.  (Id. at 3-4).  He further indicated that Plaintiff would be notified after the review was completed.  (Id.).

Plaintiff does not state the RPC's recommendation regarding the videotapes, when the recommendation was made, or whether the Chaplaincy Department authorized the tapes for inmate viewing; nor does Plaintiff state whether he was notified of the disposition of the tapes or whether he was denied access to the tapes.  He further fails to state or provide any facts that would show that the RPC, Shabazz, the Chaplaincy Department, or any other defendant intentionally delayed review of NOI tapes as opposed to tapes of other religious groups or organizations at TDCJ-CID or that they applied TDCJ policy with respect to screening and approval of religious videotapes in such a way as to deny him the opportunity to practice his religious faith.  Accordingly, Plaintiff fails to raise an issue of material fact showing purposeful discrimination

22

in violation of the Fourteenth Amendment's Equal Protection Clause or a violation of the First Amendment. Defendants are therefore, entitled to summary judgment on claim 24.

In claim 25, Plaintiff alleges theft and religious discrimination with respect to three other videotapes or DVDs[8] and a religious booklet. (Docket Entry No. 46, p. 6). Plaintiff alleges that in February 2006, he obtained Chaplain Shabazz's verbal approval to purchase these items. (Id., Docket Entry No. 46-7, p. 1). Shabazz instructed Plaintiff to have the materials sent to Shabazz's office in care of Plaintiff. (Docket Entry No. 46-7, p. 1). Plaintiff ordered the items from The Final Call, an approved TDCJ vendor. (Id.). Plaintiff asserts that when Shabazz did not answer his inquiries, he filed Grievance No. 2006109886 about Shabazz's failure to answer and he claimed that Shabazz had engaged in religious discrimination. (Docket Entries Nos. 46-1, p.7; 46-4, pp.1-4). Assistant Warden Johnson responded that Plaintiff would be notified when Shabazz received the tapes. (Id. at 2).

Plaintiff states that The Final Call delivered the materials to Shabazz's office "in care of" Plaintiff on March 15, 2006. (Docket Entry No. 46-7, p.1). Plaintiff further states that on March 30, 2006, Shabazz acknowledged receiving the videotapes, but

_____

[8]   Plaintiff uses the terms "videotapes" and "DVDs" interchangeably in claim 25. For consistency, the Court refers to these items as videotapes.

23

by this time Plaintiff had been transferred to the Clements Unit in Amarillo, Texas, where Chaplain Shabazz forwarded the religious material to the Islamic Chaplain.  (Docket Entry No. 46, p.7). Plaintiff claims that the Clements Unit's Islamic chaplain did not receive the tapes because Christian Chaplain Goad and Warden Nunn intercepted the materials and then denied that they had received the materials. (Id.).  Plaintiff asserts, "so in short they stole the tapes." Id.

    However, in his Declaration, Plaintiff states that when Chaplain Goad received the items, he called Plaintiff to his office and told Plaintiff that he was refusing Plaintiff "receipt" of the items and that he would be giving the items to the Clements Unit warden. (Docket Entry No. 46-7, p. 1).  On April 25, 2006, Plaintiff filed Grievance No. 2006144162 against Chaplain Goad asserting that Goad had intercepted the three tapes although they were clearly addressed to Islamic Chaplain Talib and that Goad had no justification to hold Plaintiff's religious tapes.  (Docket Entry No. 46-5, pp. 2-3).  Warden Nunn responded that Goad had said that the items were addressed to himself and because they were not allowed on the unit, Goad would give them to Chaplain Talib for his determination.  (Docket Entry No. 46-5, pp. 3-4).  In his Step 2 Grievance, Plaintiff indicated that the videotapes were addressed to Talib and that there were four tapes, not three.  (Id.).  He also complained that Christian and Sunni Muslim prisoners were

24

allowed to study religious tapes and DVDs on the Clements Unit but that NOI adherents were not.  (Id.)  Chaplain Pierce responded to the grievance and stated that the tape, "Jesus the Guide for the Public Servant," had been denied per TDCJ mailroom policy, that Chaplain Shabazz had denied giving Plaintiff approval to order the tapes, and that Plaintiff had been so notified, and that he may return the denied tape held by the mailroom.  (Id. at 4).

On March 28, 2006, Plaintiff wrote Warden Zeller re-urging the allegations made in the earlier grievances concerning the tapes. (Docket Entry No. 46-5, Ex. 40, pp. 6-8).  Plaintiff's summary judgment evidence includes an unsigned letter typed on paper without letterhead, dated June 14, 2006, which Plaintiff alleges was sent to him by Clements Unit Chaplain D. Schlewitz in response to Plaintiff's letter to the warden.  (Id. at 9).  In such letter, D. Schlewitz states that "[w]e had two packages for you here that were sent in our care."  (Id.).  Schlewitz further states that Chaplain Goad was no longer with TDCJ and that neither Goad, as far as he knew, nor Schlewitz had given Plaintiff permission to order the tapes; therefore, Schlewitz had "refused them."  (Id.). Schlewitz states that he had not called Shabazz because "we are not going to approve any inmate to receive DVDs, Audio Cassettes, VHS, etc."  (Id.).  Schlewitz states that Plaintiff should know this by now and that the Clements mailroom should have told Plaintiff the options that were available to him.  (Id.).

25

Plaintiff also submits invoice papers dated March 10, 2006, and March 15, 2006, from The Final Call showing four items sold to Chaplain Shabazz C/O Samuel Jones.  (Docket Entry No. 46-6, pp. 1-3).  An invoice dated May 8, 2006, shows one of the four items was returned because TDCJ required the title to be on the DVD case.  (Id.).  Plaintiff also submits US Postal Service tracking printouts and a copy of a prison trust fund printout consistent with these transactions.  (Docket Entry No. 46-6, pp. 4-6).

Plaintiff's summary evidence clearly shows that the tapes and booklet were not stolen; they were, in fact, shipped to and received at the Clements Unit.  As previously discussed, for valid security reasons, TDCJ policy does not allow inmates, like Plaintiff, to own or possess videotapes or the like.  The policy allows inmates to purchase tapes for donation to the chaplaincy department, with prior approval.  (Docket Entry No. 60-5, p. 2). Although Plaintiff alleges that Shabazz had given prior approval for him to purchase the tapes, the summary judgment record shows that the administrators at the Clements Unit, where Plaintiff was incarcerated when the tapes were delivered, had not given such approval and therefore disallowed Plaintiff receipt of the tapes per TDCJ policy.  Plaintiff does not show that these administrators or Shabazz applied the TDCJ policy with a discriminatory intent or that they applied it in such a way as to deprive him of the practice of his religious beliefs.  Accordingly, Plaintiff fails to

26

raise a material fact issue showing a First or Fourteenth Amendment violation.

To the extent Plaintiff raises a separate property deprivation claim concerning these items, Plaintiff fails to raise a genuine issue of material fact. The Due Process Clause is not implicated by random, unauthorized property deprivations where the plaintiff has an adequate post deprivation remedy under state law. Hudson v. Palmer, 104 S. Ct. 3194, 3204 (1984); Simmons v. Poppell, 837 F.2d 1243, 1244 (5th Cir. 1988). Texas provides an adequate post deprivation remedy for the loss of personal property. Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Even where prison employees intentionally deprive an inmate of his property, the deprivation does not violate the due process clause if an adequate post deprivation remedy is available. Hudson, 104 S. Ct. at 3203; Marshall v. Norwood, 741 F.2d 761 (5th Cir. 1984). Plaintiff fails to raise a genuine issue of material fact concerning property deprivation.

As a separate matter, summary judgment should be granted on claims 1, 3, 4, 24, and 25 because Plaintiff does not raise a genuine issue of material fact that he suffered a substantial burden on his religious exercise under RLUIPA. The Fifth Circuit has explained that "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the

burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion." Adkins, 393 F.3d at 570.  Plaintiff does not demonstrate that watching Farrakhan videotapes (as opposed to getting Farrahkan's teachings through other means) is a religious practice that is important to the free exercise of his religion.  Plaintiff sets forth a large number of requirements that he characterizes as mandatory and a large number of books and other materials that must be read and corresponding tapes that must be viewed, which contain the same content as some of the written materials.[9] (Docket Entry No. 55, pp. 8-10).  The Court finds that Plaintiff has not raised a genuine issue of material fact that his inability to view certain videotapes for which he may gain the content from other kinds of material constitutes a substantial burden that "truly pressures [him] to significantly modify his religious behavior and significantly violates his religious beliefs." See Adkins, 569-70 & n. 37.  Moreover, Plaintiff has not shown that being unable to view videotapes is a substantial burden on the free exercise of his religion or that it constitutes a

---

[9] Plaintiff submits an affidavit in which he states in part:  "It is mandatory that all NOI adherents study DVD/videotape lectures of Minister Farrakhan during Islamic services (i.e., Judah and Taleem)." (Docket Entry No. 55-2, p. 33).  In another affidavit, Plaintiff states, "It is mandatory that all NOI adherents study the following NOI religious material at all Islamic services: (A) All books written by .... Elijah Muhammad, (B) All books written by .... Minister Louis Farrakhan, (C) All books written by other NOI officials; (D) DVD/videotape lectures of Minister Farrakhan...."  (Docket Entry No. 55-4, pp. 12-13) (emphasis added).

violation of the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendments.

Likewise, Plaintiff fails to raise a fact issue that Defendants conspired to deprive Plaintiff or NOI adherents of the equal protection of the laws or of equal privileges and immunities under the laws pursuant to 42 U.S.C. § 1985(3).  Section 1985(3) prohibits a conspiracy "for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985.  *See* United Bhd. of Carpenters & Joiners of Am. v. Scott, 103 S. Ct. 3352, 3355-56 (1983)).  The summary judgment record does not evidence any agreement between two or more persons to deprive Plaintiff or NOI adherents of the videotapes; nor does it show a racial or religious animus behind Defendants' actions.  *See* Griffin v. Breckenridge, 91 S. Ct. 1790, 1798 (1971); Galloway v. State of Louisiana, 817 F.2d 1154, 1159 (5th Cir. 1987) (noting that plaintiff must prove discriminatory animus based on race or other inherited or immutable class characteristic such as gender, religion, national origin or based upon political association or beliefs).  Accordingly, Defendants will be granted summary judgment on claims 1, 3, 4, 9, 24, and 25.

(iii) Prayer Oil

In claim 14, Plaintiff claims Defendants' application of TDCJ policy prohibiting the purchase of prayer oil (non-alcoholic cologne) from an approved vendor violates RLUIPA.  (Docket Entry No. 1-2).  Plaintiff states his religion mandates that before performing the Jumah prayer he must (1) wash his body, (2) put on clean clothes, and (3) put on prayer oil.  Responses by prison officials to Plaintiff's grievances on this claim show that prisoners "are not allowed to purchase prayer oils for any reason" and "prayer oils are not permitted within TDCJ."  (Docket Entry No. 1-14, pp. 23, 25).  Plaintiff does not state a claim of purposeful discrimination in violation of the Equal Protection Clause.

On the other hand, Defendants' summary judgment evidence indicates that generally "Muslims are not required . . . to wear prayer oils." (Docket Entry No. 40-11, Ex. I, p.5).  However, the use of prayer oil by Muslims appears to be a common practice and at least some courts have held that an outright denial of it is a substantial burden on a Muslim prisoner's free exercise of religion. *See e.g.,* <u>Cutter</u>, 125 S. Ct. at 2121 n. 8 (2005) *citing* <u>Charles v. Verhagen</u>, 348 F.3d 601, 611 (7th Cir. 2003) (upholding district court's summary judgment in favor of Muslim prisoner on prayer oil claim under RLUIPA).  Defendants have not shown that this restriction is in furtherance of a compelling governmental interest and that it is the least restrictive means of furthering

30

that compelling governmental interest.  42 U.S.C. § 2000cc-1(a).
Furthermore, defendants have not shown a legitimate governmental
interest to justify the ban on prayer oil.

Summary judgment therefore will be denied on claim 14, but
without prejudice to Defendants' filing a supplemental summary
judgment motion that specifically addressees whether the prayer oil
restriction violates the First Amendment and RLUIPA.

### b.   Religious Practices

In claims 12, 13, 22, 29, 32, and 33, Plaintiff claims that
TDCJ refuses to accommodate specific religious practices with
respect to his diet, the practice of charity and modesty, and the
use of his religious name.  (Docket Entries Nos. 1-2, 46).

### (i)   Diet

In claim 12, Plaintiff complains that TDCJ does not afford a
meat substitute for Muslims when pork meals are served, but serves
protein substitutes, *i.e.*, a spoonful of shredded cheese or a
boiled egg when pork meals are served.[10]  (Docket Entry No. 1-2).

---

[10]   Plaintiff contends that he is not provided fruits, fish,
cereal and milk, or a meat substitute when pork is served, but admits in
his summary response that he is offered a protein substitute of cheese.
(Docket Entry No. 55-2, p.9).

In his summary judgment response, Plaintiff also makes a conclusory,
unsupported allegation that the pork substitutes at his current unit
(peanut butter mixed with apple sauce or cooking oil) are nasty and
unhealthy.  (Docket Entry No. 55-2, p.9).

In his separate Motion to Deny Summary Judgment on Plaintiff's Pork-free Claim, Plaintiff asserts that each of TDCJ's three pork-free options contains foods that are prohibited under NOI religious doctrine, *i.e.*, (1) peanut butter, (2) white bread, and (3) beans other than navy, black, and lentil beans. (Docket Entry No. 73). Plaintiff attaches to this motion exhibits that are writings by Elijah Muhammad consisting of recipes, advice on healthy eating, and similar matters. (Docket Entries Nos. 73-3, pp.3-4; 73-4, pp.3-4; 73-5, pp.2-3; 73-6, pp.2-3). These exhibits do not show that Muhammad is issuing a religious mandate that not eating potatoes, beans, or bread is a matter of religious doctrine, but rather, they tend to show discourses by Muhammad about healthy eating habits. Furthermore, the writings are inconsistent.[11]

Plaintiff has not raised a genuine issue of material fact that his free exercise rights under the First Amendment have been violated based on the pork substitutes TDCJ provides. *See* Baranowski v. Hart, 486 F.3d 112, 122 (5th Cir. 2007) (citing Kahey v. Jones, 836 F.2d 948 (5th Cir. 1988)), *petition for cert. filed*, 76 U.S.L.W. 3058 (U.S. July 31, 2007) (No. 07-137); Muhammad v. Texas Dept. of Criminal Justice, Institutional Div., 134 F.3d 368, 1997 WL 811681, *1 (5th Cir. 1997) (unpublished). In light of evidence that such substitutes are not prohibited by NOI

---

[11] In one article Muhammad states that the reader must not eat any potatoes. (Docket Entry No. 73-4, p.3). In another, he says the reader must not eat potatoes at every meal. (Docket Entry No. 73-5, p.3).

principles, he further fails to raise a material fact issue that TDCJ's policy regarding pork substitutes constitutes a substantial burden on the exercise of his religious beliefs in violation of RLUIPA or that he has suffered religious discrimination by implementation of this diet.  Defendants will be granted summary judgment on claim 12.

In claim 29, Plaintiff asserts NOI adherents are forced to touch swine by-products, which violates his religious beliefs.[12] (Docket Entry No. 46).  Plaintiff complains that TDCJ does not allow NOI adherents to sit at "non-pork eating dining tables" during meals whenever a pork meal is served.  (Id., p.9).  He claims that TDCJ policy requires that he sit at the same table as prisoners who are eating swine, which results in Plaintiff being subjected to touching items like salt shakers, pitchers, and cups which other inmates sitting at the same table may have touched and who may have pork grease on their hands.  (Id.).

Plaintiff also claims that pork by-products contaminate the food he eats.  (Id.).  He claims that TDCJ kitchen officials have inadequate separation of pork items from non pork food items on the serving line.  He contends that a pork item can be so close (two inches) to the non pork item on the serving line that the pork grease pops onto the non pork items; such proximity effectively

---

[12] Plaintiff claims that his religion strictly forbids him from eating swine, touching a swine carcass, and touching or eating swine by-products.  (Docket Entry No. 46).

33

forces Plaintiff to eat pork by-products.  (Id.).  He submits several affidavits showing that on August 22, 2006, a pork item was two to three inches from a non pork item in the food serving line in the Clements Unit inmate cafeteria and that there were pork droppings in the rice and peanut butter inserts.  (Docket Entry No. 46-9, Exs. 50-59).

Plaintiff's claim of one incident supported by affidavits does not show a violation of his free exercise of religion rights. *See* Baranowski, 486 F.3d at 122 (citing Kahey, 836 F.2d at 949-51) (holding that a prison is not required to accommodate a Muslim's request for detailed requirements concerning preparation of food which included avoiding any food cooked or served in or on utensils that had come into contact with pork).  Furthermore, Plaintiff raises only this single, specific incident, which occurred at a prison unit beyond the geographical confines of this district.  An allegation of a single incident is insufficient to warrant equitable relief.  Rizzo v. Goode, 96 S. Ct. 598, 608 (1976) (stating injunctive relief should only be granted in the "most extraordinary circumstances."); Doran v. Salem Inn, Inc., 95 S. Ct. 2561, 2566 (1975) (stating the court must consider the principles of federalism in determining whether to grant equitable relief); Milliken v. Bradley (Milliken II), 97 S. Ct. 2749, 2757 (1977) (stating the court must take into account the interests of state authorities in managing their own affairs).

34

Plaintiff's unsupported, speculative allegation that his hands may become contaminated with pork grease from other inmates' hands is too attenuated to warrant equitable relief.  Besides, Plaintiff does not show that he is prevented from taking protective measures such as using a napkin to handle items he suspects may possibly be contaminated.  *See* <u>Baranowski</u>, 486 F.3d at 122.  In any event, Plaintiff has not shown a substantial burden on the free exercise of his religion, or a violation of the First and Fourteenth Amendment by his assertion of one minor, isolated incident in the kitchen and the theoretical condition of possible contamination in the chow hall.  Defendants will be granted summary judgment on claim 29.

### (ii) <u>Charity</u>

In claim 32, Plaintiff claims that TDCJ has denied NOI adherents from practicing the mandated practice of charity by denying them the opportunity to provide indigent Muslim prisoners with toiletries, which are necessary to maintain bodily cleanliness as required by Islamic law.  (Docket Entry No. 46).

Defendants argue that Plaintiff has no standing to complain on behalf of indigent prisoners who cannot afford to purchase toiletries from the prison commissary.  (Docket Entry No. 60).  Defendants' summary judgment evidence shows that allowing Plaintiff and other inmates to give gifts to fellow inmates would have a

35

detrimental impact on prison security.[13]  (Docket Entry No. 60-4, p. 4).  Although Plaintiff's exhibits show that one principle of Islam is to give charity to the poor (Docket Entry No. 56, Ex. 97, p. 43), his exhibits do not show anything specific about providing charity to fellow prisoners as opposed to providing charity to the poor outside prison or to charitable organizations.

Plaintiff argues that Defendants' security concerns are overblown.[14]  (Docket Entry No. 66, p. 38).  Defendants' summary judgment evidence, however, shows that the only way to avoid the potential security problems raised in the affidavits is to prohibit any inmate from giving to any other inmates toiletries or other

---

[13] Clements Unit Warden Brian William Rodeen attests that such gifting would encourage trafficking and trading, which is a prison disciplinary violation. (Docket Entry No. 60-4, p.4); *see also* <u>Kaestel v. Lockhart</u>, 746 F.2d 1323, 1325 (8th Cir. 1984).  He further attests that gift giving would allow inmates to assume leadership positions over other inmates and create debtor relationships among inmates. (<u>Id.</u>).  He explains that such gifting would also allow inmates to manipulate weaker inmates.  Furthermore, he attests, such situations can lead to discord and violence and consequently create a security risk.  <u>Id.</u>

[14] Plaintiff speculates that perhaps a group of Muslim inmates could provide items to a group of poor Muslim prisoners and therefore the recipients would not know which fellow inmates gave which items. (Docket Entry No. 66, p.38).  Plaintiff's proposal does not address the fact that the recipients may learn or be told that the items they were receiving came from fellow inmates and that the identities of those inmates may also be revealed, or that other inmates, or group(s) of inmates, whether or not they were truly the benefactors, may claim to be so in order to advance their own positions of power.

Plaintiff argues with Defendants' affidavit statement that for prisoners who could not repay the gifts, this situation would create a debtor relationship with the givers.  This Court construes the affidavit to refer not to a debtor relationship in the literal or legal debtor-creditor sense, but in the interpersonal, psychological sense.

items even in an ostensibly anonymous, or collective or group manner.

Courts must apply the strict scrutiny test on prison regulations under RLUIPA with "due deference to the experience and expertise of prison . . . administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter, 125 S. Ct. at 2123 (citation omitted). In this case, the summary judgment record shows that the least restrictive means of avoiding the security problems raised by Defendants is to proscribe any individual inmate or group of inmates from giving items to other inmates. See Baranowski, 486 F.3d at 125 (noting the prison "context matters in the application of that standard," i.e., the least restrictive means of furthering a compelling governmental interest standard) (quoting Cutter, 125 S. Ct. at 2123).

Plaintiff has failed to raise a genuine issue of material fact on his claim that prohibiting inmates from giving charity to fellow inmates violates the RLUIPA, the First and Fourteenth Amendments to defeat Defendants' summary judgment showing. Defendants will be granted summary judgment on claim 32.

(iii) Religious Name

37

In claim 22, Plaintiff claims that the TDCJ has a policy that prohibits him from changing his "illegal slave" name, Samuel Lee Jones, to his religious name, Samuel Hakeem Muhammad. (Docket Entry No. 1-2).  A prisoner has a First Amendment interest in using his religious name, at least in combination with the name under which he was committed to prison.  *See* <u>Felix v. Rolan</u>, 833 F.2d 517, 518 (5th Cir. 1987).

Defendants contend that Plaintiff has not alleged nor shown that he has sought or obtained a legal name change from an appropriate state court or that he has been prevented from using his religious name along with his commitment name. (Docket Entry No. 40).  Plaintiff does not dispute either contention. (Docket Entry No. 46).  In fact, the envelopes that Plaintiff used to mail pleadings to the Clerk in this case show many examples of Plaintiff using both names, with his religious name first. (*See e.g.*, Docket Entries Nos. 9, 18, 20, 28, 29, 39, 44, 46, 47, 48, 49, 50, 52, 53, 57, 58).  Accordingly, Plaintiff has not raised a genuine issue of material fact that Samuel Jones is an "illegal" name, that the TDCJ has prevented him from changing it, or that his free exercise rights or equal protection rights have been infringed in connection with the use of his name.  Defendants will be granted summary judgment on claim number 22.

In claim 33, Plaintiff asserts that the Clements Unit mailroom has violated his First Amendment rights by refusing to process his

outgoing mail because he writes his Muslim name and "Clements Plantation" on his return address. (Docket Entries Nos. 46, 66). As explained above, Plaintiff makes no specific factual allegation nor does he otherwise support this contention.[15] In any event, Plaintiff has not shown the need for equitable relief concerning his use of the phrase Clements Plantation on his outgoing mail.[16] Plaintiff is no longer housed at the Clements Unit; he is now at the Michael Unit.[17] (Docket Entry No. 61). His unit transfer renders moot his request for injunctive relief concerning the Clements Mailroom's issuance of "Non-Mailable Correspondence" forms in response to Plaintiff using "Clements Plantation" on his outgoing mail. *See* Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002); Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001).

---

[15] In his summary judgment response on claim 33, Plaintiff claims the mailroom refuses to process mail when he writes his Muslim name along with his commitment name, or uses the phrase "Clements Plantation," or both. Plaintiff cites his Exhibit No. 49. The file does not contain such an exhibit. (Docket Entry No. 46, Part 8, contains exhibits numbered 45, 46, 47, & 48, and Part 9 contains exhibits 50 through 59.)

Other exhibits show that the Clements Unit mailroom twice generated a "Non-Mailable Correspondence" form stating Plaintiff used an incorrect address stating "this is Clements Unit not Clements Plantation." (Docket Entry No. 66, Ex. 112). The Court notes that Plaintiff has submitted many pleadings and letters to the Clerk, however, with "Clements Plantation" on the return address. (Docket Entries Nos. 9, 18, 20, 21, 28, 29, 39, 44, 46, 47, 48, 49, 50, 51, 52, 53, 57, 58).

[16] Defendants point out that they have no record that Plaintiff has exhausted his state administrative remedies on these two name change claims. (Docket Entry No. 60). Plaintiff does not dispute this or submit summary judgment evidence that he has  exhausted these claims under TDCJ's grievance procedures.

[17] Plaintiff has not alleged that the Michael Unit's mailroom personnel have a problem with Plaintiff's use of the word "plantation."

Defendants will be granted summary judgment on Plaintiff's claim 33.

### (iv) <u>Modesty</u>

Plaintiff contends in claim 13 that his religion mandates that he protect his modesty. (Docket Entry No. 1-2). In the first instance, Plaintiff claims that TDCJ employees violate the Fourth Amendment and RLUIPA by routinely strip-searching him in the presence of people, including female officers. He also claims he is required to stand in the nude while waiting to be issued a clean pair of boxer shorts before and after showers during clothing exchange. (<u>Id.</u>).

Plaintiff has not stated specific instances where he was searched by females. Plaintiff, however, alleges that on June 13, 2005, he was strip-searched by a male officer in the presence of a female officer. (Docket Entry No. 55, p.34). Plaintiff claims this alleged search alone raises a material fact question regarding a violation of the First Amendment and RLUIPA. In support of this claim, Plaintiff relies upon the opinion in <u>Show v. Patterson</u>, which states "the core inquiry is whether a reasonable prison official would have believed that the group strip search and the refusal to separate the Muslim inmates violated RFRA, the First Amendment or the Fourth Amendment." 955 F.Supp. 182, 193 (S.D.N.Y. 1997). Plaintiff, however, fails to note that the <u>Show</u> Court

40

determined the existence of a material fact question regarding the validity of the search on more than free exercise of religion concerns, as follows:

> The Court has already determined, however, that a genuine issue of fact exists as to whether the strip search was reasonable given plaintiffs' allegation that they were never actually searched, visually or physically. Similarly, defendants have not established that the simultaneous strip search of plaintiffs with other inmates was reasonable in light of plaintiffs' allegations that (1) on other occasions Muslim inmates had been searched separately; and (2) approximately fifteen guards were present when the inmates were ordered to remove their clothes.

Id., at 190.  Other courts, including the court that decided Show v. Patterson, have upheld strip searches of Muslim inmates under the First Amendment and RLUIPA.  See Still v. Wilkinson, 7 Fed. Appx. 356, 357, 2001 WL 303518, *1 (6th Cir. 2001) (upholding search involving specific threat on First Amendment grounds); Jean-Laurent v. Wilkerson, 438 F.Supp. 2d 318, 324 (S.D.N.Y. 2006) (holding that second strip search of Muslim inmate invalid because it did not further a compelling governmental interest under RLUIPA because the plaintiff had been in presence of guards since a prior search, which was not held to be in violation of RLUIPA).

TDCJ policy is that male inmates are only strip-searched in the presence of female officers in extraordinary circumstances and when approved by the Warden.  (Docket Entry No. 40-8, Ex. F, p.4). Defendants' evidence shows that contraband is a security problem and endangers the safety of inmates and officers and therefore

41

inmates are routinely strip searched in certain circumstances. (Id., p.7). Defendants' evidence further shows that routine strip searches are necessary for the compelling governmental interest of safety and security in the TDCJ. (Id.). Strip searches are the least restrictive means of furthering the governmental interest of safety and security because officers conduct them to find contraband that can only be found with a strip search. (Id.).

Prison security, in and of itself, is a compelling state interest, and deference is due to institutional officials' expertise in this area. Cutter, 125 S. Ct. at 2124 n. 13. RLUIPA does not elevate accommodation of religious observances over a prison's need to maintain order and safety, and any accommodation must be measured so that it does not override other significant interests. Id at 722. Defendants, in this case, have shown their strip search policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest under Cutter. Furthermore, the strip searches by male officers do not violate the Fourth Amendment. See Bell v. Wolfish, 99 S. Ct. 1861, 1884 (1979); Elliott v. Lynn, 38 F.3d 188, 191 (5th Cir. 1994).

Plaintiff has not raised a genuine issue of material fact that the strip searches by male officers violate RLUIPA or the First and Fourteenth Amendments. In support of his conclusory complaint about routine strip searches being conducted by males in the

presence of female officers, Plaintiff's *specific* allegation is of only one incident, on June 13, 2005, 19 months before Plaintiff filed this pleading.  Such an isolated incident does not raise a genuine issue of material fact sufficient to warrant the issuance of equitable relief.  <u>Rizzo</u>, 96 S. Ct. at 608; <u>Doran</u>, 95 S. Ct. at 2566; <u>Milliken</u>, 433 U.S. at 280-81.[18]  Accordingly, Defendants will be granted summary judgment on Plaintiff's claim number 13 concerning strip searches.

Defendants have not addressed Plaintiff's other claim, that during clothing exchanges he is required to stand in the nude in the presence of females while waiting to be issued a clean pair of boxer shorts before and after showers.  *See* <u>Canedy v. Boardman</u>, 16 F.3d 183 (7th Cir. 1994) (holding that Muslim inmate entitled to some accommodation to avoid unnecessary observations by female guards of his unclothed body on privacy grounds and noted possible amendment under RFRA).  Accordingly, summary judgment will be denied without prejudice on this clothing-exchange claim.

_____

[18] In any event, the allegations in Plaintiff's Complaint about strip searches in the presence of females pertain to 2005, before he was transferred to his present unit.  *See* Docket Entry Nos. 9, 11, 12 (notices of change of address).  That claim therefore is also moot.  *See* <u>Oliver</u>, 276 F.3d at 741; <u>Herman</u>, 238 F.3d at 665.  More recently, in a late-filed response opposing Defendants' motion for summary judgment, Plaintiff claims to have been strip searched in the presence of women numerous times in a three-month period in 2007, but he provides no specifics and no proof.

c.   <u>Religious Services and Ministry</u>

Plaintiff makes various claims asserting religious discrimination and even hostility against adherents of the NOI sect primarily concerning the hiring of chaplains and religious services in claims numbered 7, 8, 10, 11, 15, 17, 18, 20, 21, 27, and 28.

(i)  <u>Religious Holidays</u>

In claim 15, Plaintiff declares TDCJ is committing religious discrimination and violating RLUIPA by not "acknowledging" two NOI observance days, Saviour's Day and Holy Day of Atonement. (Docket Entries Nos. 1, 55).  Plaintiff's own exhibits show that this request has been referred to the Religious Practice Committee for discussion and approval.[19]  Plaintiff does not allege or show that TDCJ officials have denied his request concerning two religious observance days.  Plaintiff has not shown an infringement on his right to the free exercise of religion or a substantial burden on the exercise of his religion, nor has he shown purposeful religious discrimination.  Accordingly, Plaintiff has not shown a First Amendment, equal protection, or RLUIPA violation.  Defendants are entitled to summary judgment on claim 15.

_____

[19] Plaintiff cites exhibits 9, 10, 11, 69, 70, 74(p.31), 92, 93, 94, 95 in support of this claim.  (Docket Entries Nos. 1, 55).  One exhibit, a TDCJ Inter-Office Communication listing religious holidays shows that these two days were not listed as of November 1, 2004, as religious observance days. (Docket Entry No. 1-16, Ex. 11).  The Court notes there are no exhibits 92, 93, 94, 95 in the Clerk's file.

(ii) <u>Nation of Islam Spiritual Leaders</u>

In claims 10 and 21, Plaintiff asserts that TDCJ administrative and religious officials have conspired to hire only Islamic Chaplains who are adherents of the Muslim American Society and are followers of Warith Deen Mohammed or the Sunni orthodox doctrine and that TDCJ has not hired any NOI Ministers as full-time paid TDCJ Chaplains in violation of RLUIPA. (Docket Entry No. 1-2). Plaintiff has not alleged any specific facts showing a conspiracy nor any facts showing that Defendants intentionally hired only Muslim chaplains of certain persuasions or intentionally avoided hiring available, qualified NOI chaplains. *See* <u>Wilson v. Budney</u>, 976 F.2d 957, 958 (5th Cir. 1992); <u>Streetman v. Jordan</u>, 918 F.2d 555, 557 (5th Cir. 1990). *See also* <u>Davis v. Wall</u>, 50 F.3d 1033, 1995 WL 136204, *4-5 (5th Cir. 1995) (unpublished) (rejecting as having no legal basis inmate's complaint that prison did not hire a NOI chaplain). Plaintiff has not raised a genuine issue of material fact under claims 10 and 21 under RLUIPA, the First Amendment, or the Equal Protection Clause. Accordingly, Defendants are entitled to summary judgment on claims 10 and 21.

In claim 31, Plaintiff alleges that Defendants Pierce, Lopez, and Shabazz collaborated to deny a NOI volunteer minister entry inside the prison system. (Docket Entry No. 46). Specifically, Plaintiff claims that an outside NOI minister, Doyne Muhammad, submitted his volunteer application to TDCJ officials in February

45

or March 2006.  Five months later Muhammad's application had not been processed nor had he been contacted about the application or its status.  (<u>Id.</u>).

Plaintiff complains that the processing of Doyne Muhammad's request has taken a long time but he makes no factual allegations asserting any specific acts or omissions by any Defendant that caused or contributed to the failure to complete the processing of Muhammad's request or delayed the process.  *See* <u>Allen v. Wright</u>, 104 S. Ct. 3315, 3324 (1984) (stating that an alleged injury must be traceable to the challenged conduct by defendant).  Furthermore, Plaintiff makes no specific factual allegations of any acts or omissions by any Defendant related to Muhammad's request that are based on religious discrimination.  Plaintiff fails to raise a genuine issue of material fact that he is entitled to relief on claim 31 and Defendants will be granted summary judgment.

### (iii) <u>Religious Services</u>

In claims 7, 8, and 17, Plaintiff asserts that TDCJ officials prevent him and other NOI adherents from teaching classes and giving religious sermons based on their NOI doctrine to other Muslim and non-Muslims prisoners at Jumah and Taleem services. (Docket Entry No. 1-2).  In claims 27 and 28, Plaintiff asserts that TDCJ officials do not allow him to pray separately so he can invoke the name of his God, Fard Muhammad, and recite out loud the

NOI National Pledge and Opening Prayer. (Docket Entry No. 46). He
claims that the services are conducted by Sunni Orthodox Muslims
who are of the same Muslim sect as the Muslim chaplains. (Id.).
In claim 18, Plaintiff also alleges a violation of the court's
decree in Hyde v. Texas Dep't of Criminal Justice, 948 F.Supp. 625
(S.D. Tex. 1996). (Id.). Plaintiff further contends in claim 20
that NOI adherents are being denied equal protection under TDCJ's
religious accommodation policy because NOI adherents are not given
the same opportunities of involvement in the exercise of their
religious beliefs as are Sunni/Orthodox Muslims. (Id.).

Defendants' summary judgment evidence shows that because of
the large number of prisoners and to best serve the needs of the
most prisoners, TDCJ offers generic worship services for all Muslim
prisoners. (Docket Entry No. 40-10, Ex. H, p.4). "In a prison
setting, and in view of the numbers and variations involved, to
provide separate Jumah (the main Muslim worship service) services
for each sub-group of the Islamic faith would not be feasible."
(Id., pp.5-6). The evidence further shows that "[several factors
are considered in the scheduling of all religious activities,
including staff supervision requirements, unit and individual
security concerns as set forth in Agency policy, and the
availability of TDCJ approved religious volunteers to assist."
(Id., pp.2-3). "To require TDCJ to provide religious services to
all the different faith groups would be virtually impossible for

numerous reasons, including, but not limited to, the large number
of faiths, the number of offenders, security concerns, staffing and
space limitations, and the large geographical expanse TDCJ covers."
(Id., p.9).  *See* Nation of Islam v. Michigan Dept. of Corrections,
69 F.3d 537, 1995 WL 631589, *1 (6th Cir. 1995) (unpublished)
(finding "defendants showed that the decision to deny the NOI
prisoners' request for individual services and meetings was
reasonable").

     Plaintiff, however, argues that RLUIPA requires TDCJ to
accommodate NOI adherents with respect to their unique religious
practices because it is mandatory that NOI adherents study the
teachings of their leaders at the Jumah and Taleem services.[20]
(Docket Entry No. 55).  Plaintiff does not allege or show that he
was completely prevented from conducting any formal or informal
group study, teaching, or sermon-giving at any particular
appropriate time.  He instead claims he cannot do these things at
the religious services held for all Muslim prisoners of various

---

[20] Plaintiff claims that unlike the Sunni Orthodox Shahadatian, where
Muslims must aver that Muhammad Ibn Abdullah is the last Messenger of
Allah (God), he must state his NOI Shahadatian by declaring that Elijah
Muhammad is the last messenger.  (Id., p.12; Docket Entry No. 55-2, Ex.
65, p.39).  Plaintiff argues that Defendants have admitted in an Inter-
Office Memorandum that for an inmate "to be allowed to participate in
their Islamic services (*i.e.* Jumah) the inmate must recite the Sunni
Shahadatian (declaration of faith) word for word." (Docket Entry No. 55,
p. 11).  Plaintiff has misread the Inter-Office Memorandum.  It recites
as the Second Shahadatian: "I bear witness that Muhammad Ibn Abdullah is
the Messenger of Allah," *not* the "last messenger."  Plaintiff has not
raised a genuine issue of material fact that the declaration Plaintiff
claims he must sign to participate in Jumah services is a substantial
burden on his free exercise of religion.

Muslim sects. (<u>Id.</u>).   In this respect, Plaintiff has not met his burden of showing a substantial burden on his free exercise of religion. <u>Adkins</u>, 393 F.3d at 569-70; <i>see also</i> <u>Johnson v. Baker</u>, 67 F.3d 299, 1995 WL 570913, *4-5 (6th Cir. 1995) (unpublished) (upholding denial of separate religious services for NOI inmates under the Religious Freedom Restoration Act ("RFRA")).

The summary judgment evidence establishes that the generic Muslim service is structured for all Muslim inmates, not exclusively for any sub-group. Further, Defendants have satisfied their burden to show that a unified Muslim service is the least restrictive means of achieving compelling government interests of security concerns, and staffing limitations and space constraints.[21] (Docket Entries Nos. 40, pp.10-12; 40-10, Ex. H; 40-7, Ex. E). "To require TDCJ to provide religious services to all the different faith groups would be virtually impossible for numerous reasons, including, but not limited to, the large number of faiths, the number of offenders, security concerns, staffing and space

---

[21] Defendant Pierce attests that "[s]ervices are structured in such a manner as to employ that which is held in common within the major faith group category. Thus all participants experience some of what they would experience within their own unique worship traditions, but no participant experiences exactly what he or she would experience within a worship service conducted according to the traditions specific to his or her subgroup." (Docket Entry No. 40-10, Ex. H, pp. 4-5). Citing the difficulty in scheduling Friday services and the scarcity of Muslim chaplains and volunteers, Pierce further attests that "[i]n a prison setting, and in view of the numbers and variations involved, to provide separate Jumah (the main Muslim worship service) services for each sub-group of the Islamic faith would not be feasible." (<u>Id.</u> at 6). Pierce further attests to other opportunities open to inmates to grow spiritually. (<u>Id.</u> at 7).

limitations, and the large geographical expanse TDCJ covers." (Id., at 9).[22]   The RLUIPA standard must be applied consistent with consideration of costs and limited resources.   Cutter, 125 S. Ct. at 2123.

Plaintiff's listing of Sunni mandatory practices and his allegation that the generic services are actually Sunni services do not defeat Defendants' summary judgment showing.   Plaintiff, who has no demonstrated expertise in the Sunni sect, provides no competent evidence to support his allegations about required Sunni practices at Sunni services nor sufficient evidence to show that the TDCJ services fulfilled these alleged Sunni requirements.   See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2510-11 (1986) (stating if evidence rebutting the motion for summary judgment is only colorable or not significantly probative, summary judgment should be granted); Krim v. BancTexas Group, Inc., 989 F.2d 1435, 1442 (5th Cir. 1993) (noting unsubstantiated or conclusory assertions that a fact issue exists will not suffice to defeat a properly supported motion).   Accordingly, Plaintiff has not defeated Defendants' summary judgment showing that his free

---

[22] Plaintiff's sub-set of Islam, NOI, is shown in the summary judgment evidence, as of September, 2006, to have had 533 adherents, compared to 6,693 self-identified Muslims who did not link themselves to NOI.  The summary judgment evidence reflects approximately 140 different religions, sub-sets of religions, and individual religious sects.  More inmates identified themselves as Wiccans than identified themselves as NOI.  More than 39,000 inmates identified themselves as Baptists, but not even they are allowed separate services from the generic non-Roman Catholic Christians.

exercise rights were not substantially burdened, but regardless, even if Plaintiff's objections to the Muslim services did indicate a substantial burden on Plaintiff's practices, the impositions alleged in claims 7, 8, 17, 18, 27, and 28 have been shown by Defendants as a matter of law to be in furtherance of a compelling governmental interest and constitute the least restrictive means of achieving that interest.

Plaintiff has not shown a First Amendment violation under these claims because he is allowed a reasonable opportunity to practice his religion and the TDCJ's structure is reasonably related to legitimate penological interests. *See* Boxer X v. Donald, 169 Fed. Appx. 555, 2006 WL 463243, *3-4 (11th Cir. 2006) (no First Amendment or equal protection violations when prison provided congregational religious services based on "generic abstractions" of actual denominational faiths, including generic Islamic services, and denied separate services for the Lost-Found Nation of Islam). Plaintiff has not shown an equal protection violation because he has not shown purposeful discrimination by Defendants in their structuring of the Muslim generic services. *See generally* Freeman v. Texas Dep't of Criminal Justice, 369 F.3d 854 (5th Cir. 2004) (finding First and Fourteenth Amendments were not violated by TDCJ religious accommodation policy). Contrary to Plaintiff's contention, he has not shown a violation of Hyde v. Texas Dep't of Criminal Justice, which provided for Jehovah's

51

Witnesses to meet under conditions comparable to adherents of similar groups, including Muslims, who enjoyed a more lenient meeting policy than Jehovah's Witnesses. 948 F.Supp. 625 (S.D. Tex. 1996).

Accordingly, the Court will grant summary judgment on Plaintiff's claims 7, 8, 17, 18, 20, 27, and 28.

### (iv) <u>Hostility toward NOI adherents</u>

In claim 11, Plaintiff asserts that the Islamic Chaplains have systematically conspired to create an atmosphere of extreme hostility toward the NOI prisoners. A plaintiff claiming conspiracy must allege facts showing that the defendants agreed to commit an illegal act. <u>Arsenaux v. Roberts</u>, 726 F.2d 1022, 1024 (5th Cir 1982). Plaintiff's conclusory conspiracy allegations against Defendants do not justify the granting of relief. <u>Wilson</u>, 976 F.2d at 958; <u>Streetman</u>, 918 F.2d at 557. Furthermore, he has not alleged any specific facts against any Defendant acting alone or in conjunction with others, showing actions designed to create or foster hostility against NOI prisoners. *See* <u>Allen</u>, 104 S. Ct. at 3324 (holding an alleged injury must be traceable to the challenged conduct by defendant). Plaintiff has not raised a genuine issue of material fact under RLUIPA on the First or Fourteenth Amendments.

52

Accordingly, Defendants are entitled to summary judgment on claim 11.

B.   <u>Other Claims</u>

1.   <u>Consent Decree</u>

Plaintiff in his claim 2 alleges that the TDCJ and Shabazz are violating the Court decree in <u>Brown v. Beto</u>, Civil Action No. H-69-CV-74, (S.D. Tex. 1977) by, among other things, implementing a rule that prohibits NOI adherents from studying or reading NOI literature at the established Jumah and Taleem services. (Docket Entry No. 1). <u>Brown v. Beto</u> was a consent decree signed by Judge Robert O'Conner in 1977, which essentially provided Muslims the opportunity to practice their religion in prison on a basis equivalent to adherents of other major religions. These terms of the decree are largely reflected in the TDCJ rules and policies shown in the summary judgment evidence in this case. Plaintiff in a later pleading disavowed this claim.   (Docket Entry No. 66, p. 2).

Defendants correctly argue that if Plaintiff does assert violations of the <u>Brown v. Beto</u> decree, he must seek equitable relief in that case, citing <u>Gillespie v. Crawford</u>, 858 F.2d 1101 (5th Circ. 1988) (*en banc*).   (Docket Entry No. 40).   Although Plaintiff claims otherwise (Docket Entry No. 46), he is a member of the class in the <u>Brown v. Beto</u> decree.   (Docket Entry No. 1-11,

p.3).  Therefore, the opinion in _Gillespie_ precludes Plaintiff from
seeking  relief  here.    Accordingly,  Defendants  are  entitled  to
summary judgment on claim 2.

### 2.    Negligent Supervision

In  claim  5,  Plaintiff  alleges  that  Pierce  and  Lopez  had
knowledge  of  the  religious  discrimination  against  Plaintiff  and
other NOI adherents but instead of remedying the situation, they
conspired  with  the  other  Defendants.    (Document  Entry  No.  1-2).
This  allegation  is  not  a  separate  claim  from  the  other  claims
raising religious discrimination.  To the extent it is a separate
claim, it will be dismissed.

Negligence does not constitute a constitutional deprivation.
_See_ _Daniels v. Williams_, 106 S. Ct. 662, 663 (1986); _also see_
_generally_ _Shidler v. Moore_, 409 F.Supp. 2d 1060, 1068-69 (N.D.Ind.
2006).    Further,  Plaintiff  has  presented  no  summary  judgment
evidence of negligence on the part of Pierce or Lopez that caused
any  injury  to  Plaintiff  over  which  this  Court  would  have
jurisdiction.    Defendants  will  be  granted  summary  judgment  on
claim 5.

### 3.    Grievances

Plaintiff states in claim 26 that Defendants are continuously
conspiring to take several months to answer his grievances and in

some cases they do not answer the grievances at all, thus hindering Plaintiff in exhausting his administrative remedies.  Plaintiff does not have a constitutional right to a grievance procedure.  <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994); *see also* <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 97 S.Ct. 2532, 2544 (1977) (Burger, C.J., concurring) (lauding prison grievance procedures but not suggesting they are constitutionally required).  Plaintiff has no due process liberty interest in having his grievances resolved. *See* <u>Geiger v. Jowers</u>, 404 F.3d 371, 373-74 (5th Cir. 2005).  To the extent he raises a separate claim concerning grievances, he fails to state a claim upon which relief may be granted and fails to show a genuine issue of material fact.  Plaintiff's allegation that Defendants are hindering him from exhausting his administrative remedies, even if true, is not determinative of any issue in this case because none of Plaintiff's claims is being dismissed solely for failure to exhaust his administrative remedies under the TDCJ grievance procedures.  Moreover, Plaintiff fails to state any facts that would give rise to a conspiracy to deprive him of any federal constitutional or statutory rights.

Defendants will be granted summary judgment on claim 26.

4.  <u>Retaliation</u>

In claims 6 and 30, Plaintiff alleges that Defendants twice retaliated against him for engaging in constitutionally protected

conduct by transferring him to another unit. (Docket Entries Nos. 1, 46). To prevail on a retaliation claim, a prisoner must show (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his exercise of that right, (3) a retaliatory adverse act, and (4) causation. <u>McDonald v. Steward</u>, 132 F.3d 225, 231 (5th Cir. 1998).

Plaintiff in claim 6 alleges that he was retaliated against for engaging in constitutionally protected conduct. On some unspecified date in 2003, Chaplain Shabazz came to the Beto I Unit and summoned Plaintiff to Chaplain Kiser's office where Shabazz threatened to transfer Plaintiff if he did not stop filing grievances. (Docket Entry No. 1-2). Plaintiff claims he continued to file grievances; thereafter, on July 30, 2004, TDCJ religious officials transferred him to the Wynne Unit in Huntsville, where Shabazz's office is located. (Docket Entries Nos. 1-2, 46, 66).

Defendants' summary judgment evidence shows that Shabazz has no authority to transfer inmates. (Docket Entry No. 40-10, p.8). Plaintiff does not dispute such evidence. Accordingly, Plaintiff has not raised a genuine issue of material fact defeating Defendants' summary judgment showing a lack of causation on Plaintiff's first retaliatory transfer claim.[23]

---

[23] This retaliation claim is also subject to dismissal because, as Defendants point out, he has failed to fulfill the exhaustion requirement of 42 U.S.C. § 1997e(e) by filing a grievance on this claim. (Docket Entry No. 40). Under Title 42 U.S.C. section 1997e, an inmate must exhaust his administrative remedies before filing suit. *See* <u>Underwood v. Wilson</u>, 151 F.3d 292, 296 (5th Cir. 1998).

In claim 30, Plaintiff claims that after his transfer to the Wynne Unit he continued to file religious discrimination grievances against Shabazz. (Docket Entry No. 46).  He further claims that he started receiving death threats from the Sunni Orthodox Muslim prisoners, at the urging of Chaplain Shabazz. (Id.).  Plaintiff maintains that on February 2, 2006, he requested a life-endangerment transfer, which the Wynne Unit Warden denied.  (Id.).  Plaintiff contends that Shabazz was infuriated that Plaintiff had filed a life endangerment claim and therefore conspired with the Wynne Unit warden to issue Plaintiff a retaliatory transfer to the Clements Unit in Amarillo, Texas. (Id.; Docket Entry No. 6).  (Plaintiff does not reconcile that the claimed "retaliatory transfer" served to fulfill his own request for a "life endangerment transfer.") Plaintiff contends Shabazz sought such a transfer to hinder Plaintiff's elderly mother in visiting Plaintiff.  (Id.).

Defendants' summary judgment evidence, however, shows that while a unit warden may request a transfer, the final decisions on whether an inmate will be transferred and, if so, to which unit he will be transferred, are made by the Classification and Records Department in Huntsville, Texas.  (Docket Entry No. 60-2, Ex. A).

Plaintiff's allegations of a conspiracy to transfer Plaintiff to another unit because Plaintiff had filed a life endangerment claim and requested a life endangerment transfer are not supported by allegations of any specific facts, much less competent summary

judgment evidence. Furthermore, Plaintiff does not refute Defendants' evidence that the Classification and Records Department in Huntsville has final authority over transfers, not wardens or chaplains.

The summary judgment record does not raise a genuine issue of material fact that any of Defendants conspired to retaliate against Plaintiff by transferring him to another prison unit, that his transfer was a retaliatory act, or that Plaintiff's First Amendment rights were violated. Defendants will be granted summary judgment on claim 30.

### III.  Order

Based on the foregoing, the Court ORDERS the following:

1.   Defendants' Motion for Summary Judgment (Docket Entry No. 40) and Supplemental Motion for Summary Judgment (Docket Entry No. 60) are GRANTED on all claims except Plaintiff's claim 14 concerning prayer oil and part of claim 13 concerning strip searches in which Plaintiff alleges that he is required to stand in the nude while waiting to be issued a clean pair of boxer shorts before and after showers during clothing exchanges. Defendants are DENIED summary judgment without prejudice on claim 14 and part of claim 13 regarding nude clothing exchanges and these claims are retained for further proceedings. Defendants are ORDERED to file an amended or

supplemental motion for summary judgment on these retained claims or explain why summary judgment is inappropriate within sixty (60) days of entry of this Order. Plaintiff is ORDERED to file a response to Defendants' amended or supplemental motion for summary judgment within thirty (30) days after the motion is filed.

2.  Plaintiff's Motion to Deny Defendants' Summary Judgment Motion or Grant Plaintiff a Continuance (Docket Entry No. 53) is DENIED.

3.  Plaintiff's Motions for Summary Judgment (Docket Entries Nos. 55 and 66) are DENIED concerning the claims on which this Court granted summary judgment for Defendants. Plaintiff's Motions for Summary Judgment (Docket Entries Nos. 55 and 66) are DENIED without prejudice to reconsideration insofar as the motions raised genuine issues of material fact on the claims retained for further proceedings: claim 14 and claim 13 on the allegation concerning nude clothing exchanges.

4.  Plaintiff's Motion for Leave to File an Amended Complaint (Docket Entry No. 67); Plaintiff's Motion to Amend Complaint (Docket Entry No. 68); and Motion in Support of his Amended Complaint Motion (Docket Entry No. 71), all of which were filed after Plaintiff already had supplemented his Complaint *and* after the Defendants' motions for summary judgment had been filed and answered, are DENIED.

5.   Plaintiff's Motion to Deny Defendants Summary Judgment on Plaintiff's Pork-Free Claim and Motion for Continuance of Case (of twelve weeks) (Docket Entry No. 73) is DENIED.

6.   Plaintiff's Motion for Permission to File a Motion to file a Supplemental Opposition Summary Judgment Motion and Cross Summary Judgment (Docket Entry No. 75) and Plaintiff's Motion to File a Supplemental Opposition Summary Judgment Motion (Docket Entry No. 74) are DENIED.  Plaintiff has been granted prior extensions of time to respond to the summary judgment motions. (Docket Entries Nos. 54 and 64).  In the second order granting an extension of time, the Court stated "no additional extensions of time will be granted except upon extraordinary cause shown."  (Docket Entry No. 64).

7.   All other pending motions and requests for relief are DENIED. The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 28th day of September, 2007.


_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

60